IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,          )
                                   )
        Plaintiff,                 )     CR. NO. 14-cr-167
                                   )
     vs.                           )
                                   )
MICHAEL LAWRENCE EISNER,           )
                                   )
          Defendant.               )
_____)

TRANSCRIPT OF SENTENCING

October 31, 2014


---


BEFORE:      THE HONORABLE GERALD BRUCE LEE
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
                 BY: CHAD GOLDER, ESQ.



FOR THE DEFENDANT: OFFICE OF THE FEDERAL PUBLIC DEFENDER
                 BY: KEVIN BREHM, ESQ.



---

OFFICIAL COURT REPORTER: RENECIA A. WILSON, RMR,CRR
                         U.S. District Court
                         401 Courthouse Square
                         Alexandria, VA  22314
                         (703)501-1580

1            (Thereupon, the following was heard in open

2    court at 9:11 a.m.)

3            THE CLERK:  1:14 criminal 167, United States

4    versus Michael Lawrence Eisner.

5            MR. GOLDER:  Good morning, Your Honor.  Chad

6    Golder on half of the United States.

7            THE COURT:  Good morning.

8            MR. BREHM:  Good morning, Your Honor.  Kevin

9    Brehm on half of Michael Eisner who is present.

10           THE COURT:  Good morning, Mr. Eisner.

11           Good morning, Mr. Brehm.

12           MR. EISNER:  Good morning.

13           THE COURT:  Mr. Brehm, I take it that you and

14   Mr. Eisner have reviewed the presentence report.

15           MR. BREHM:  We have, Your Honor, and there is

16   one objection that we've made to the offense level

17   calculation and that -- we set forth that in our

18   guidelines memorandum.

19           That's simply an issue where there was an

20   account opened in a victim's name that apparently was a

21   personal friend of Mr. Mark Head who is a co-conspirator

22   with Mr. Eisner on some fraud schemes and that Mr. Head

23   would have had personal identifier information of that

24   particular individual, opened the account, and then after

25   the account was opened, part of the fraud that Mr. Head

1   and Mr. Eisner were involved together involved making use

2   of that account.

3           So our position was that the enhancement for

4   the use of the identifier should not apply to Mr. Eisner.

5   That was Mr. Head's doing.  Later on, Mr. Eisner and

6   Mr. Head both took advantage of the account as part of

7   the fraud, but not in the creation of the account.

8           The parties --

9           THE COURT:  This is a conspiracy case; is

10  that right?

11          MR. BREHM:  It is a -- conspiracy is one of

12  the counts.  That's the first count.

13          THE COURT:  All right.

14          MR. BREHM:  Conspiracy to commit wire fraud,

15  addressing a number of different schemes.  And the plea

16  agreement, the parties certainly agree to certain

17  enhancements, did not really anticipate that the two

18  levels for the identification issue would apply.  So,

19  that was not a joint recommendation.  We know that's not

20  binding on the Court or Probation.  But it's our

21  contention that that one -- two level enhancement would

22  not apply in this case and would result in a lower

23  guideline range than is calculated in the presentence

24  report.

25          The range that is in the presentence report

1   now is a range of 97 to 121 months, and that's based on a

2   total offense level of 30 with Criminal History

3   Category 1.  And so what we're asking the Court to do is

4   by removing that one enhancement, that would take the

5   total offense level down to 28.  And again, at Criminal

6   History Category 1, the resulting range is then 78 to

7   97 months.  We believe that's the accurate technical

8   calculation of the advisory range in this case.

9              THE COURT:  All right, now, Mr. Brehm --

10             MR. BREHM:  Yes.

11             THE COURT:  -- I left it on my desk

12   apparently.  Your client wrote me a very long letter.

13             MR. BREHM:  Yes, sir.

14             THE COURT:  In the letter, he acknowledged

15   that Mr. Head and he met, and Mr. Head was going to pay

16   his cousin, KC, a portion of the proceeds from the

17   Fidelity account and that he knew the Fidelity account

18   had no money in it.  How should I weigh that in

19   considering this argument that you're saying about

20   whether or not he's responsible for knowing about the use

21   of KC's name in this account to steal money?

22             MR. BREHM:  Well, I believe that --

23   Mr. Eisner's understanding from Mr. Head, since Mr. Head

24   was somehow connected to KC, at the time was that KC was

25   willing allowing Mr. Head to use his information in

1    exchange for a payment from Mr. Head.

2           So, Mr. Eisner did understand that the

3    account was -- of course, it was opened in KC's name.  It

4    wasn't opened in Mr. Head's name and obviously would have

5    been used -- when it's opened, it would have used

6    identifiers for KC.  Mr. Eisner would have understood

7    that reality.  But I believe his understanding at the

8    time with Mr. Head was that was something that KC was

9    agreeable to in exchange for a payment of funds.

10          Now later, the use of the account was

11   fraudulent, and that's what we are arguing was the

12   conduct involved Mr. Eisner and Mr. Head in the

13   conspiracy was this subsequent misuse of the account, so

14   to speak.  So, we think that's how that explains or

15   answers your question, Your Honor.

16          THE COURT:  All right, thank you.

17          Mr. Golder.

18          MR. GOLDER:  Your Honor, as you know, we

19   didn't seek this enhancement in the plea agreement and

20   our recommendation wasn't based on it.  But just to get

21   the facts straight, Your Honor hit on exactly what we

22   were going to say.  Mr. Eisner's own letter indicates why

23   this would apply on the facts.  He went to Mark Head and

24   said, I need to steal more money.  Teach me how to steal.

25          They opened this account.  They used KC's

1   name for the expressed purpose of this fraud.  It was an

2   unauthorized use of the account for this fraud.  He used

3   that to create this identity.

4           Beyond that, KC had no knowledge whatsoever

5   that this account was being used.  As a co-conspirator,

6   it doesn't matter whether it's Mr. Head or Mr. Eisner,

7   and we -- we have evidence that Mr. Eisner knew exactly

8   what was going on all along.

9           THE COURT:  Is KC supposed to get a portion

10  of the proceeds?

11          MR. GOLDER:  KC got nothing.  KC knew nothing

12  about it.  When the agent knocked on KC's door, this was

13  the first time he learned that his name had been used.

14          THE COURT:  All right.  Thank you.

15          Mr. Brehm, I understand your objection, and

16  I -- I'm going to overrule it.  I think because it's a

17  conspiracy case that a conspirator can be --

18  co-conspirator can be liable for the acts of his

19  accomplices, even if he doesn't know about all of the

20  acts being taken, so long as they're reasonably

21  foreseeable under the guidelines.

22          So, having said that, the guideline objection

23  will be overruled, and the guidelines remain as stated in

24  the presentence report.

25          I note the government has acknowledged the

1  plea agreement, and I'm prepared to follow the plea

2  agreement as to say the guidelines are advisory, and the

3  government's not seeking a guideline sentence in the

4  case.

5         Does the government want to be heard on

6  sentencing in the matter?

7         MR. GOLDER:  Very briefly, Your Honor.

8         THE COURT:  It would help me also if you all

9  would address the comparison of Mr. Eisner to Mr. Head as

10 well.

11        MR. GOLDER:  Absolutely.

12        What I was going to say, Your Honor, I begin

13 with this.  Your Honor's received a lot of paper in the

14 past week.  I do want to make sure because the victim is

15 here who wrote a letter.  I know Your Honor has read that

16 letter.  But I do want to emphasize the point that was

17 made in the --

18        THE COURT:  If the victim wants to speak,

19 they can.

20        MR. GOLDER:  The victim does not want to

21 speak.  But with all the paper flying around, I do want

22 to be sure to emphasize how this began.

23        Mr. Eisner committed fraud on his legal

24 clients.  That is something that Mark Head did not do,

25 stole more than $200,000 from his legal clients,

1    including the one who is here today.

2              As Your Honor read in the letter, that kind

3    of activity from a trusted, legal advisor, stripped him

4    and his wife of any quote, "remaining dignity and left us

5    even more defenseless, weak and susceptible to financial

6    risk".

7              That's a significant offense in and of itself

8    that Mark Head did not commit.  When that crime was over,

9    Mr. Eisner went to Mark Head and said, teach me how to

10   steal more.  And he stole a lot of money in a short

11   amount of time.

12             We do not disagree with the defendant's most

13   recent filing, I believe it was yesterday, that Mark Head

14   did this over a longer period of time.  But the fact that

15   Mr. Eisner committed such substantial fraud more --

16   $1.1 million in such a short amount of time is

17   significant in and of itself.

18             In addition, because it is a conspiracy case,

19   Your Honor, as you recognized some of the losses are

20   overlapping in that Mark Head was responsible for

21   teaching Mr. Eisner about the fraud, but Mark Head did

22   not benefit to the same amount for their co-conspirator

23   activity that Mr. Eisner did.

24             Hundreds of thousands of dollars that were

25   part of their joint activity went to Mr. Eisner.  So in

that respect while they're both responsible for the

losses, the notion that the losses are higher for

Mr. Head and not for Mr. Eisner are a bit deceiving,

because it was Mr. Eisner for the actual losses that

benefitted more than Mr. Head.

All of that together, Your Honor, we believe

that a higher sentence is justified here for Mr. Eisner.

He didn't cooperate the way Mr. Head did.  He committed

this separate substantial and significant crime on his

legal clients, and he did benefit roughly the same

amount, more than a million dollars.  It's significant in

and of itself.

We understand and we appreciate -- we read

the lengthy letter from Mr. Eisner as well, and we

understand that there are a lot of serious and mental

health and drug-related issues, but we do believe that

these crimes required forethought, required planning.

And when you read the letter from the victim

again, and I'll close with that, in addition to stealing

their money there's a line in that letter that I wasn't

aware of before reading that letter which is while all of

this was happening, Mr. Eisner told this client that he

had had a stroke.  Well, that never happened.  The kinds

of lies that came up in this case to his own legal

clients were quite significant and quite shameful.  And

1    we do believe an appropriate punishment is deserved here.

2              THE COURT:  Thank you.

3              Mr. Brehm, I'll hear from you.

4              MR. BREHM:  Thank you, Your Honor, and we do

5    submit a number of pleading addressing some of these

6    different issues and our recommendations.  So, I just

7    want to take a moment to address the question you just

8    asked the government a moment ago about the relationship

9    and comparison with Mr. Head.

10             I think based on what the government's saying

11   I would suggest to the Court on the one hand you

12   certainly have Mr. Head involved in a number of fraud,

13   some overlapping with Mr. Eisner, some not.  They cover

14   an extended period of time of about six years resulting

15   in a far more actual loss that the conduct of Mr. Eisner.

16             And then I understand what the government's

17   saying is that well, Mr. Eisner had a particular position

18   of trust as an attorney that related to some of the fraud

19   conduct, not all of it, some of it, and that there's a

20   certain counterweight there.

21             I would suggest, then, that if you want to

22   look at it in that respect, when Mr. Head received

23   48 months that the government clearly stated in their

24   position paper in his case they thought was adequate for

25   deterrence based on the scope and severity of his fraud

1    conduct --

2

3            THE COURT:  But, was Mr. Head's case just

4    straightforward or did he have some additional motion

5    filed by the government in his case?

6            MR. BREHM:  It's my understanding -- I'll

7    just get to that.  I appreciate it.  My understanding is

8    the government made a recommendation of a deduction for

9    cooperation of ten percent.

10           THE COURT:  All right.

11           MR. BREHM:  Real minuscule amount.  I'm not

12   sure exactly why.  But I can tell you that nothing that

13   Mr. Head did led Mr. Eisner to decide to plead guilty.

14           Mr. Eisner was not a target letter or

15   pre-indictment negotiation case.  He was indicted

16   May 15th of this year, arrest warrant issued.  He was

17   arrested soon after.

18           And when he was arrested by the FBI without

19   having any contact with a defense attorney, Mr. Eisner

20   agreed to give them a written statement, which he signed,

21   admitted conduct to the agents immediately.  And so, he's

22   been in a posture of wanting to resolve the case ever

23   since his arrest.  He didn't have an attorney at that

24   time to do any type of pre-indictment negotiation,

25   because it went straight to indictment for some reason.

1    So once he made his appearance in this

2  district, our office was appointed, myself in particular,

3  and we began discussions with the government.  We started

4  receiving some discovery.  And we were in a posture to

5  try to settle the case from that point on.

6    Mr. Head's case had already been resolved, so

7  Mr. Eisner was of no value to cooperate against Mr. Head.

8  Mr. Head was first in the door, so to speak.

9    But again, Mr. Eisner's decision to resolve

10 this case had nothing to do with what Mr. Head did or did

11 not do.

12    THE COURT:  All right.

13    MR. BREHM:  So again, it maybe that's

14 reflected in the government's recommendation of only ten

15 percent reduction for cooperation.  I don't know.  But

16 there was some cooperation apparently by Mr. Head that

17 resulted in their motion, certainly.

18    Again, I think some of these things might

19 counterweigh, so I certainly ask the Court to consider

20 that when you do this comparison, there's obviously some

21 difference like apples and oranges have some difference,

22 but they're both a type of fruit with some similarities.

23    In this case, I think that difference is kind

24 of counterweighed.  So a sentence for Mr. Eisner, we

25 argue, should be very close at least to Mr. Head and not

1   much greater than that, if at all.

2          We think certainly even 48 months, just as

3   the government thought it was for Mr. Head substantial

4   enough for deterrence and a punishment for his conduct, I

5   think anything greater that 48 months would be

6   unnecessary for Mr. Eisner in terms of adequate

7   punishment for his conduct as well as deterrence for

8   himself and others.  We think that the Court should at

9   least consider something in that range of time.

10          I would ask for some recommendations of the

11   Court, if you consider.  One is that you recommend the

12   Intensive Drug Program, that RDAP program since

13   Mr. Eisner clearly has substantial substance abuse issues

14   that he's trying to get a handle of and apparently that's

15   thought to be a fairly good program and is very

16   intensive.  So we ask you to recommend the RDAP program.

17          And also, Your Honor, there is a particular

18   BOP facility, the FCI facility at Fort Dix, New Jersey.

19   It has the RDAP program there, and it's also relatively

20   close to his family and friends.

21          As you may recall from the PSR, he actually

22   lived up in the New York area and that's where he's been

23   staying while he's been on bond.  So we'd ask the Court

24   to recommend the facility at Fort Dix along with the drug

25   treatment RDAP recommendation.

1          And then finally, I think, in one our

2    pleadings we asked the Court to consider voluntary

3    surrender in this case, just as Mr. Head received in his

4    case and ask that if there's voluntary surrender, he be

5    allow to surrender sometime on or after January 8th.

6    That may well be the amount of time it takes them to

7    designate anyway, but that get us through the holidays

8    with his family, especially his young daughter he's

9    trying to maintain some contact with.  So we'd ask you to

10   consider that as well.

11              THE COURT:  All right.

12              Come up, Mr. Eisner.  Mr. Eisner, is there

13   any statement you'd like to make in your own behalf?

14              MR. EISNER:  Yes, Your Honor.  Your Honor,

15   I'm not proud of the circumstances in which I appear

16   before the Court today.  However, I'm relieved this day

17   has finally come and that I'm facing the consequences of

18   my actions.

19              I've had the better part of three years to

20   reflect on my past behavior and to think about how my

21   actions have impacted others.  I've read Ms. Freeman's

22   impact statement in its entirety many times in the past

23   few days.

24              I've been filled with regret and guilt for

25   many years over the way that I handled their case.  It

1  was difficult to read about what they've experienced as a

2  result of my failure to fulfill my duties, particularly

3  my failure to pay the IRS on their behalf.

4  　　　　　　I gradually subtracted the funds that I was

5  holding on their behalf with the assumption that the

6  majority of the funds would be awarded as fees and that

7  when the time came to pay the tax claims, I would have

8  the money to do so.

9  　　　　　　This was unethical, wrong, dishonest and a

10  complete breach of trust that they placed in me.  I

11  thought only of myself and placed my needs and desires

12  above all others, including the firm's clients and even

13  my own family.

14  　　　　　　I am sincerely sorry for the harm that my

15  actions have caused Mr. and Mrs. Freeman and their

16  family.

17  　　　　　　I do not expect to earn their forgiveness,

18  but I will do all I can to pay them back.  I am equally

19  sorry for the impact that my actions had on Mr. Tyell.

20  He entrusted me with the care of a large sum of money.

21  And like the Freeman, I slowly borrowed this money over a

22  period of time without his knowledge or permission, with

23  the unfounded belief that I would have the money at a

24  future date to repay him.

25  　　　　　　I clearly breached my fiduciary duties to him

and the trust that he had placed in me.  He is a good person and a good friend -- and was a good friend and not a day goes back that I do not think about how my actions must have impacted him.

I'll work as hard as I can to pay him back every cent that is he owed, and it's my sincere hope that I can someday earn his forgiveness.

I'd also like to apologize to the firm's former clients that were impacted by my behavior.  My use of drugs and alcohol resulted in prolong absences from the office and my eventual hospitalization and month in rehab resulted with the firm's clients having to find new counsel without my help.

I would like to apologize to the financial institutions that I impacted through several schemes with the co-defendant and to my mother and wife for utilizing their identities to take out several business lines of credit.

I believe I have earned both of their forgiveness and trust back, but now I still have a long way to go.  They've both been unbelievably supportive, and I could not have made it through this without them.

I've lost the respect of pretty much everyone in my life, including friends and family.  Most importantly, I lost respect for myself in the wake of my

1   actions.

2           After two long years of spiritual reading and

3   practice, psychiatric treatment, reestablishing and

4   prioritizing my values, earning back the respect of

5   others by making amends for my past actions and by

6   keeping promises by coming to terms with the past and by

7   maintaining sobriety from alcohol and drugs, I've begun

8   the long process of healing.

9           I believe I should be punished for my actions

10  and believe I am deserving of a period of incarceration.

11  I intend to utilize the time to continue to address my

12  mental health and substance abuse issues and to acquire

13  whatever training and education available in order to

14  give me the best chance possible to again be a productive

15  member of society.

16          I have no illusions about how difficult the

17  process will be, but all I can do is try.

18          Thank you, Your Honor.

19          THE COURT:  Mr. Eisner, you're before the

20  Court for conspiracy to commit wire fraud and three

21  counts of wire fraud.

22          It is fair to say that you were an attorney

23  who engaged in breathtaking fraud, not only against your

24  clients, but also credit cards companies and banks.

25          Your scheme with Mark Head was exacerbated by

the Fidelity Cash Management Account, the scheme you all had involving cars and trying to refinance them.  It's breathtaking.

And I've read your ten page confession. That's what it seems to be to me, the story of your life and confession.  And, I contrast that -- I mean, well, first of all, you're not comparable to Mark Head because you earned the right to hang a shingle and become an attorney.  And I've read how you and your wife struggled in college.  You changed schools, and then you decided to go to law school.  And you worked your way through law school.  Many of us had to do that.  And, apparently, your work with Sandra O did not teach you how not to practice law.  You learned things from her about how to practice law.  But I can't blame her and neither can you for the things that you did.

And yes, I sentenced Sandra O and I told her at the time of sentencing I would give her a lot more time than 81 months, but she had cooperated against a former client in Maryland.  That's why she got an 81 month sentence.  That's why, not because of anything that I did.

I just think that when you do what you did here, you stole your own mother's identity and your wife's identity and then ran up credit cards.  Gambling,

drugs, alcohol, getting drunk early in the morning, going

to West Virginia to gamble in the middle of the night.

These things are just bizarre from the standpoint of

someone who's worked that hard to come to school to

become an attorney.

You're right.  There are many things you did

here that are just so wrong on so many levels, and you

must be held accountable for them.  I've given a great

deal of thought to this as I always do about sentencing,

trying to figure out what's the appropriate sentence for

you as distinct from anyone else.

And I have here the letter from the victim

LF.  It said "the decision to pursue Chapter 11

bankruptcy, let alone the process of filing, completing

the requirements was demanding, draining and left us

vulnerable.  The attorney-client relationship was

critical because the trust required to address and

overcome often overwhelming financial circumstances.  My

husband and I completely replied upon Mr. Eisner and

followed his advice implicitly.  We now feel terribly

deceived and wary of attorneys in the entire bankruptcy

process".

People going through bankruptcy are already

in distress.  And what you did was to make it even worse

for them, worse for the court and worse for all other

1  attorneys because clients read about people like you

2  doing crazy things like this, stealing their money and

3  dishonoring the profession and then getting away with

4  some kind of slap on the wrist.

5           This is not a single case of a lawyer

6  succumbing to taking money from the trust account.  You

7  didn't even have a trust account.  You never had one,

8  according to you.

9           On page five, you said "I maintained a proper

10  trust account.  I did this with the irrational belief at

11  the time I would be able to repay the amounts at the time

12  they were due".  Well, that's often the story of

13  attorneys who steal from the trust account.  No one will

14  ever know.

15           It's called a trust account for a reason,

16  Mr. Eisner, and you abused all of that trust.

17           I have considered your parents' letters and

18  what's remarkable to me -- and I have them all here and I

19  want you to know I read them.

20           And I read that your wife says that she

21  believes that you've made a change and the veil of

22  darkness that obscured your true nature has fallen away

23  and that you're now a new person.

24           And, that you -- your mother says that she

25  found out about your involvement with drug and it's not

1    the Michael that she knows.

2          Your mother's employer believes you've taken

3    the right steps to change your behavior.  Your

4    sister-in-law talks about she's seen you transformed.

5    And, Ms. Sloan says "I believe the law firm that hired

6    him right out of law school was so corrupt, they

7    distorted and clouded Michael's views and sent him in the

8    downward spiral that put him where he is today".

9          So we're talking about two different people.

10   On the one hand there's the person who comes from the

11   middle class background, who worked his way through

12   school, became an attorney, had his own practice, stole

13   everything and ruined his life.  And the other is someone

14   his family doesn't know.  So, you're a person who has two

15   faces and they're both devious.

16          I've decided to do this.  I'm going to send

17   you to prison for 72 months on each count.  The

18   conviction will run concurrent with each other, which is

19   six years.  And the reason for the six years is because I

20   think you should be punished more than Mark Head because

21   of your background as an attorney.

22          I'm going to make you -- you're required to

23   pay the $100 special assessment per count which is $400

24   right away.  I'm going to place you on a three-year term

25   of supervised release that will have all the standard

1   conditions, including that you participate in substance

2   abuse treatment and testing at the direction of the

3   probation officer, that you pay restitution in equal

4   monthly installments of not less than $250 a month within

5   60 days of your release from incarceration until paid in

6   full.

7           You shall pay child support.  And whether or

8   not you and your wife get back together or not, if you

9   get back together, that's one thing.  But if not, you're

10  required to pay child support and report to juvenile

11  court to have that scheduled.

12          If you were to win the lottery, some income

13  tax refund or inheritance, unanticipated financial gain,

14  that's to be applied to the restitution amount.

15          You're not to open any new lines of credit or

16  credit cards without the approval of the probation

17  officer.  You're required to provide the probation

18  officer with access to any requested financial

19  information.

20          You're to participate in substance abuse

21  testing and treatment at the direction of the probation

22  officer and participate in mental health treatment and

23  the cost to be paid by you.  And you're required to sign

24  a waiver of confidentiality so the probation officer can

25  speak to your mental health professional.

1            The restitution amount is $1,153,357.78 and

2    the victims' names are set forth in the presentence

3    report.  My understanding is that your lawyer and the

4    government have identified at least a list of who the

5    various victims are, including the victims present today.

6            I will grant your attorney's request you

7    participate in the Intensive Drug Treatment Program and I

8    will recommend to the Bureau of Prisons that you serve

9    your sentence at Fort Dix, New Jersey, if that is

10   available.

11           I will not allow you to voluntarily

12   surrender.  I will remand you to custody at this time.

13   Thank you.

14           We're in recess until 10 o'clock.

15           MR. GOLDER:  Your Honor, we have a

16   restitution order.

17           THE COURT:  All right, you can hand it up.

18           (Proceeding concluded at 9:38 a.m.)

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER


1        I, Renecia Wilson, an official court

reporter for the United State District Court of Virginia,

Alexandria Division, do hereby certify that I reported by

machine shorthand, in my official capacity, the

proceedings had upon the sentencing in the case of United

States of America vs. Michael L. Eisner.

      I further certify that I was authorized and

did report by stenotype the proceedings and evidence in

said sentencing, and that the foregoing pages, numbered 1

to 23, inclusive, constitute the official transcript of

said proceedings as taken from my shorthand notes.

      IN WITNESS WHEREOF, I have hereto subscribed

my name this 16th day of January, 2015.


                        /s/
                   Renecia Wilson, RMR, CRR
                   Official Court Reporter