UNITED STATES DISTRICT COURT
Eastern District of Virginia
Alexandria Division



FILED
MAILROOM

JUL - 9 2015

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA,  )
                            )
v.                          )     Case #: 1:14CR00167-001
                            )
MICHAEL LAWRENCE EISNER,    )
                            )
              Defendant.    )
_____)

## DEFENDANT MICHAEL LAWRENCE EISNER'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

COMES NOW the Defendant, Michael Lawrence Eisner ("Eisner"), proceeding pro se, and hereby files this Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 and in support thereof respectfully represents as follows:

### I. Factual Summary

1. Eisner was arrested on May 21, 2014 pursuant to a twenty-one (21) count Indictment charging him with conspiracy to commit wire fraud, wire fraud and one count of aggravated identity theft.

2. Eisner agreed to plead guilty to Counts 1, 2, 11 and 15 of the Indictment for one count of conspiracy to commit wire fraud and three counts of wire fraud. The Government agreed to dismiss the remaining wire fraud counts and the aggravated identity theft count in consideration for Eisner's guilty plea (herein referred to as the "Agreement").

3. Section Five of the Agreement contains an appeal waiver which provides that Eisner "waives the right to appeal the conviction and any sentence within the statutory maximum...on the grounds set forth in Title 18, United States Code, Section 3742 or on any ground whatsoever." Section Three, however, provides that "the Court...may impose a sentence above or below the advisory sentencing range, <u>subject only to review by higher courts for reasonableness</u>"

1

(emphasis added).

    4.    Eisner's sole co-defendant, Mark Head ("Head") also plead guilty and was sentenced, several weeks prior to Eisner, to forty-eight (48) months in prison less a ten percent (10%) reduction pursuant to a Motion filed by the Government for substantial assistance resulting in a total sentence of approximately forty three (43) months.

    5.    The Agreement provided an initial sentencing guideline range of 78-97 months. The Court, after hearing oral arguments from the Government and Eisner's counsel, adopted the Presentence Report's recommendation of a sentencing guideline range of 97-121 months which included a two-point production of identification enhancement not included within the Agreement pursuant to U.S.S.G. § 2B1.1(b)(11)(C).

    6.    Eisner was sentenced on October 31, 2014 to seventy-two (72) months in prison, three (3) years of supervised release and was ordered to pay $1,153,357.78 in restitution pursuant to a Restitution Order. Of said amount of restitution, $349,963.00 was to be paid jointly and severally by Eisner and Head to Bank of America.

II.    **Motion Pursuant to 28 U.S.C. § 2255**

    A prisoner in federal custody may challenge the legality of a federal sentence by filing a motion under 28 U.S.C. § 2255 on four grounds: (1) the sentence imposed on the prisoner was in violation of the Constitution or the laws of the United States; (2) the Court lacked jurisdiction to impose the sentence; (3) the sentence exceeded the maximum amount allowed by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). However, a non-constitutional error can serve as a basis for relief under § 2255 when it involves "a fundamental defect which inherently results in a complete miscarriage of justice." United States v. Addonizio, 442 U.S. 178,

185 (1979).

A § 2255 motion "may not do service for an appeal," and claims that have been waived are procedurally defaulted unless the petitioner can show cause and actual prejudice. United States v. Frady, 456 U.S. 152, 165-67 (1982). In order to show actual prejudice, a petitioner must show that the alleged errors "worked to his actual and substantial disadvantage." Id. at 170. An exception applies where a petitioner asserts a claim for constitutionally ineffective assistance of counsel." See United States v. Gastiaburro, 16 F. 3d 582, 590 (4th Cir. 1994). An appeal waiver will also not prevent a collateral attack where the government has breached the plea agreement or the terms of the plea agreement are ambiguous with respect to which rights were waived. Where a plea agreement is ambiguous, it must be construed against the government. See United States v. Jordan, 509 F. 3d 191, 199-200 (4th Cir. 2007). Since a habeas corpus petition is a civil action, the petitioner must establish the allegations by a preponderance of the evidence. Jacobs v. United States, 350 F. 2d 571, 574 (4th Cir. 1965). As a pro se litigant, Eisner is entitled to have his motion and its asserted issues construed liberally. Gordon v. Leeke, 574 F. 2d 1147 (4th Cir. 1978).

The claims asserted and addressed herein are outside of the appeal waiver in the following respects. First, the claims arising from inefficient assistance of counsel and prosecutorial misconduct are not barred by the appeal waiver. Secondandly, as stated herein the Government breached the terms of the Plea Agreement. Third, the language of Section Five of the Agreement conflicts with the language of Section Three of the Agreement which permits appellate court review of the imposed sentence for reasonableness. To the extent that the provisions are in conflict, said conflict must be construed against the Government. See Whiteside v. United States, 748 F. 3d 541, 546

(4th Cir. 2014) (holding language of an appeal waiver was unclear in that it did not clearly specify which rights were waived and that the ambiguity would be construed againt the government which permitted the defendant's challenge to a career offender enhancement in a collateral proceeding). Finally, the imposed sentence can be challenged on collateral review since the errors as stated herein caused Eisner actual prejudice.

### III.  General Ineffective Assistance of Counsel Standard

A criminal defendant is entitled to effective assistance of counsel pursuant to the Sixth Amendment of the Constitution.  That is, "representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms."  Bobby v. Van Hook, 558 U.S. 4, 7, 130 S. Ct. 13 (2009).  The right to effective assistance of counsel extends to all aspects of the proceedings including sentencing.  "Sentencing is a critical stage of trial at which a defendant is entitled to effective assistance of counsel, and a sentence imposed without effective assistance must be vacated and reimposed to permit facts in mitigation of punishment to be fully and freely developed."  United States v. Breckenridge, 93 F. 3d 132, 135 (4th Cir. 1996); see also Glover v. United States, 531 U.S. 198, 203-204 (2001).  Claims for ineffective assistance of counsel are evaluated under the two-prong test set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  The Supreme Court held that a defendant alleging ineffective assistance of counsel must show that: (1) his counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance caused the individual prejudice.  Strickland, 466 U.S. at 687-688.

Regarding the first prong, "the proper standard for attorney performance is that of reasonably effective assistance."  Id. at 687.  When considering whether an individual has satisfied this requirement, a reviewing court must

4

judge counsel's conduct against "an objective standard of reasonableness." Van Hook, 558 U.S. at 7. In determining what is reasonable, the Court in Strickland referred to the usefulness of the American Bar Association Standards. Strickland, 466 U.S. at 688 ("Prevailing norms of practice as reflected in the American Bar Association Standards and the like are guides to determining what is reasonable but they are only guides.").

To satisfy the second prong a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. With regards to establishing ineffective assistance of counsel at sentencing, a defendant must show that but for counsel's error there is a reasonable probability that he would have received a shorter sentence. See Glover v. United States, 531 U.S. 198, 203-04 (2001); see also Lafler v. Cooper, 132 S. Ct. 1376, 1384-85 (2012); Lockhart v. Fretwell, 506 U.S. 364, 370 (1993) (holding that "the touchstone of an ineffective-assistance claim is the fairness of the adversary proceeding."). In defining what constitutes a "reasonable probablity" the Supreme Court has held a "reasonable probability" is a less demanding standard than "more likely than not." Kyles v. Whitley, 514 U.S. 419, 434 (1995). The level of prejudice that a defendant must demonstrate lies between prejudice that "had some conceivable effect" and prejudice that "more likely than not altered the outcome in the case." Strickland, 466 U.S. at 693.

IV.    Argument - Issues Involving Ineffective Assistance of Counsel

   A. Counsel for Eisner failed to investigate and present mitigating evidence at Sentencing.

Counsel for Eisner failed to investigate and present mitigating evidence at Eisner's Sentencing hearing and failed to pursue several grounds for a downward departure under the Sentencing Guidelines. Counsel's deficient

performance caused Eisner prejudice in that there is a reasonable probability that the Court would have imposed a lower sentence had Eisner received constitutionally effective assistance of counsel.

Strickland does not impose a duty upon defense counsel to "investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing," but it does require counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691; see also Wiggins v. Smith, 539 U.S. 510, 533 (2003).

In determining what is reasonable, the Court in Strickland referred to the usefulness of the American Bar Association Criminal Justice Section Standards as guides. See Strickland, 466 U.S. at 688. After referring to the ABA Standards, the Court in Wiggins held that "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence'." Wiggins, 539 U.S. at 524.

Numerous ABA Standards, in addition to State Codes of Professional Conduct, impose upon defense counsel a duty to act with reasonable diligence on behalf of a criminal defendant. ABA Standard 4-1.3(a) imposes upon defense counsel a general duty to "act with reasonable diligence and promptness in representing a client." ABA Standard 4-3.6, governing "prompt action to protect the accused," requires defense counsel to advise the defendant of his rights and take all action necessary to enforce such rights," including, for example, "obtaining psychiatric examination of the accused when a need appears...". ABA Standard 4-4.1 imposes upon counsel a broad duty to "conduct a prompt investigation of circumstances of the case and explore all avenues leading to facts relevant to the merits of the case." Said duty applies "regardless of the accused's admissions or statements to defense counsel of facts

6

constituting guilt or the accused's stated desire to plead guilty."  In the sentencing phase, ABA Standard 4-8.1(b) provides that "if a presentence report or summary is made available to defense counsel, he or she should seek to verify the information contained in it and should be prepared to supplement or challenge it if necessary."  "In the end, 'a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.'" Tucker v. Ozmint, 350 F. 3d 433, 440 (4th Cir. 2003) (quoting Wiggins, 539 U.S. 510); However, "a failure to pursue a particular course of action is not considered strategic when it is not a conscious reasonably informed decision made by an attorney with an eye to benefitting his client." Pavel v. Hollins, 261 F. 3d 210, 218 (2d Cir. 2001).

There is prejudice to the defendant when an error results in a longer sentence than would otherwise have been imposed. See Glover v. United States, 531 U.S. 198, 202-04 (2001); see also Royal v. Taylor, 188 F. 3d 239 (4th Cir. 1999) (holding that the Strickland standard applies to counsel's actions at sentencing and requiring only a showing that the "sentence would have been more lenient" absent counsel's errors.).

Counsel for Eisner failed to investigate for and pursue all reasonably available mitigating evidence as detailed below.  Moreover, counsel for Eisner failed to file motions for downward departures under the Guidelines as detailed below.  Said errors caused Eisner prejudice since there is a reasonable probability that he would have received a more lenient sentence than was imposed.

1. **Counsel for Eisner failed to investigate for or present any mitigating evidence regarding Eisner's mental health conditions or history at sentencing or to move for a downward departure.**

7

Counsel for Eisner failed to investigate for or present any mitigating evidence regarding Eisner's mental health conditions or history at sentencing or to move for downward departures pursuant to U.S.S.G. § 5K2.13 and § 5H1. U.S.S.G. § 5K2.13 provides that a downward departure is warranted if "(1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." The commentary to U.S.S.G. § 5K2.13 clarifies the meaning of "significantly reduced mental capacity" by providing that "significantly reduced mental capacity means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." U.S.S.G. § 5K2.13, cmt. n. 1. Courts have interpreted the standard set forth in U.S.S.G. § 5K2.13 to justify a downward departure on the basis of diminished mental capacity as not being "that the defendant recognizes the difference between right and wrong, which may negate intent, but rather that his diminished mental capacity significantly impaired his judgment or his ability to understand the wrongfulness of his actions." U.S. v. Valdez, 426 F. 3d 178, 184 (2d Cir. 2005). U.S.S.G. § 5H1.3 provides that a departure may be warranted if mental conditions are "present to an unusual degree and distinguish the case from typical cases covered by the Guidelines."

In the instant case, at no point during the course of the representation did counsel advise Eisner of or explore the possibility of retaining a private mental health expert to evaluate Eisner's mental health condition, to present mitigating evidence at sentencing or to supplement the mental health history contained in the Presentence Report. In the event Eisner was unable to afford a psychiatric evaluation, counsel could have sought the appointment of a

8

professional pursuant to 18 U.S.C. § 3006A by filing a motion with the Court. Counsel made no effort to explore this possibility or to even discuss this matter with Eisner despite Eisner's lengthy mental health history, the Presentence Report's undocumented recountment of said history (as of the date of the last amendment to the Presentence Report several days before sentencing the majority of Eisner's medical records had even been received) and the Government's attempted minimization of Eisner's mental health condition in their Sentencing Memorandum, in which the Government seems to take the position that possessing intelligence sufficient to become a lawyer and to open a law firm is somehow incompatible with the progression of significant mental health issues.

Counsel was repeatedly confronted with evidence of Eisner's history of Major Depression, General Anxiety Disorder and Bi-Polar Disorder. Eisner informed counsel of his history at their initial meeting at the Arraignment in May of 2014 and numerous other times throughout the course of the representation. Counsel was present at the meeting with the Probation Officer held via telephone in which Eisner summarized his mental health history. Said history included intensive, ongoing mental health treatment with many different providers since 2000 and three hospitilizations in psychiatric hospitals, two of which occurred within eighteen (18) months of each other and coincided with the period of the offense conduct. One of the hospitilizations was a Virginia State Court ordered involuntary commitment in November of 2010. The final hospitalization was also an involuntary confinement in July of 2012. The Presentence Report provided that Eisner's brother stated that Eisner suffered from mental health issues from an early age. Eisner's wife also stated that he suffered from mental health issues. The Report also described Eisner's family history of mental health issues, notably Eisner's father who suffers

from Bi-Polar disorder and Schizophrenia.

In 2012, Eisner's primary psychiatrist during the period of the offense conduct, Sabah Hadi, M.D., wrote a letter to the Virginia State Bar detailing the seriousness and progression of Eisner's mental health issues, and recommended that Eisner cease practicing for at least two years in order to to receive adequate treatment. The Affidavit Declaring Consent to Revocation of Eisner's law license provided that "Respondent has acknowledged that he is not in a position to operate a law practice," and that he "has a substance abuse problem, as well as ongoing mental health issues." Counsel was also aware of Eisner's ongoing mental health treatment with a New York based psychiatrist.

Despite the foregoing, counsel made no efforts to obtain or review Eisner's medical records, despite offers by Eisner to assist in obtaining said records, nor did counsel make any effort to discuss Eisner's mental health condition with any of Eisner's past or current treatment providers. In fact, counsel expressly declined to present written correspondence and reports from Eisner's psychiatrist at sentencing. Said medical records clearly establish that Eisner possesses severe mental health disorders separate and apart from his history of substance abuse. Notably, Eisner's psychiatrist attributed Eisner's conduct to manic episodes attributable to Bi-Polar Disorder. Evidence of Eisner's severe mental health issues are reflected in the Government's concession at sentencing that "we understand and we appreciate--we read the lengthy letter from Mr. Eisner as well, and we understand that there are a lot of serious and mental health and drug-related issues." (Sentencing Tr. Pg. 9, 13-16). The Sentencing Transcript is attached hereto as Exhibit A. The Court also classified Eisner's exhibited behavior as "bizarre", "Gambling, drugs, alcohol, getting drunk early in the morning, going to West Virginia to gamble in the

middle of the night. These things are just bizarre from the standpoint of someone who's worked that hard to come to school and become an attorney." (Sentencing Tr. Pgs. 18-19, 25-5).

Thus, despite being repeatedly confronted with evidence of Eisner's mental impairment, counsel completely "ignored these red flags and failed to investigate for mental health evidence or consider introducing evidence on that issue." Gray v. Branker, 529 F. 3d. 220, 231 (4th Cir. 2007); see also Rompilla v. Beard, 545 U.S. 374, 392 (2005). "Where it is apparent from the evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance." Hall v. Washington, 106 F. 3d 742, 749-50 (7th Cir. 1997) (citing Stewart v. Gramley, 74 F. 3d 132, 135 (7th Cir. 1996)); see generally ABA Standard 4-4.1.

Counsel's failure to investigate and present mitigating evidence, and to file motions for a downward departure prejudiced Eisner in several respects. The sentencing transcript makes it clear that the Court made no findings with respect to Eisner's mental health condition and possible diminished capacity. In fact, the Court's classification of Eisner's behavior as bizarre and its decision to remand Eisner immediately into custody clearly evidence that the Court placed no weight on Eisner's mental health history. Had mitigating evidence been presented the Court would have had a context for understanding the behaviors exhibited by Eisner and would likely not have remanded him into immediate custody without him possessing any of his psychiatric medications or permitting him any opportunity for appointments with his primary psychiatrist leading up to the date of incarceration. Nothing in the record reflects that the Court in any way recognized Eisner's mental health impairments or questioned

their severity to support a diminished capacity departure. <u>See United States</u> <u>v. Valdez</u>, 426 F. 3d 178, 186 (2d Cir. 2005) (upholding the district court's findings because they were supported by the record, "The district court explicitly recognized that appellant had emotional and mental impairments, and simply questioned whether those impairments were of such severity to support a diminished capacity downward departure. It concluded they were not.".).

While Eisner has a long history of substance abuse, there was substantial documentation available to counsel of his significant mental health issues which contributed to the commission of the offenses. Thus, without conducting any type of investigation into Eisner's history it was not reasonable to conclude that Eisner's diminished capacity was <u>caused</u> by the use of drugs. Courts have consistently held that pyschiatric conditions are the basis for granting a motion for a downward departure. <u>See United States v. Blake</u>, 89 F. Supp. 2d 328 (E.D.N.Y. 2000) (granting downward departure due to defendant's psychiatric condition); <u>United States v. Liu</u>, 267 F. Supp. 2d 371 (E.D.N.Y. 2003) (departing downward based on defendant's diminished capacity resulting from addiction to gambling); <u>United States v. Glick</u>, 946 F. 2d 335 (4th Cir. 1991) (granting downward departure); <u>United States v. Cantu</u>, 12 F. 3d 1506 (9th Cir. 1993) (granting downward departure on basis that post traumatic stress disorder constitutes a "significantly reduced mental capacity"); <u>see also Rita</u> <u>v. United States</u>, 551 U.S. 338 (2007).

Counsel could have also argued that Eisner's mental health issues were present to "an unusual degree" to support a departure under § 5H1.3. Eisner's mental health history is more significant than that of the average white collar offender sentenced under the Guidelines, especially as compared to other attorneys that have been sentenced for similar crimes.

The record also reflects that the Court placed no weight on Eisner's mental

health history in its analysis of the 18 U.S.C. § 3553(a) factors. While the
Court varied downward from the Guidelines range it did not explain its reasons
for the extent of the variance as discussed herein. Had the Court placed
adequate weight on Eisner's mental health history it is likely the Court would
have imposed a more lenient sentence. The mitigating evidence also likely
would have factored into the Court's analysis in avoiding unwarranted disparity
between Head's and similarly situated defendants' sentences.

Thus, Counsel's failure to conduct any investigation into Eisner's mental
health history for purposes of presenting mitigating evidence at sentencing
or for filing a motion for a downward departure pursuant to U.S.S.G § 5K2.13
and § 5H1.3 fell below an objective standard of reasonableness. Counsel's
decision not to present any mitigating evidence cannot be considered "sound
strategy" as there was at no point an investigation into Eisner's mental health
condition. While the Court varied from the Guidelines range, the Court did
not explain the basis for arriving at its sentence and the record does not
evidence any weight or consideration being given to Eisner's mental health
history, it is likely the Court would have granted a more lenient sentence
if it had before it a motion for a downward departure. In the alternative,
the Court would have imposed a larger downward variance based on the § 3553(a)
factors had evidence been presented by counsel at sentencing.

   **2. Counsel failed to argue that the intended loss calculation
       overstated the seriousness of the offense and failed to
       file a Motion for a Downward Departure under the Sentencing
       Guidelines.**

Counsel failed to argue that the intended loss calculation overstated
the seriousness of the offense and failed to file a Motion for a Downward

Departure under the Sentencing Guidelines. Counsel's errors were not the result of objectively reasonable judgment and as a result Eisner suffered prejudice in receiving a longer sentence than he would have otherwise received. Application Note 20(C) to U.S.S.G. § 2B1.1 provides a basis for a downward departure from the defendant's Guideline range where the loss calculations overstate the seriousness of the offense: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." Eisner had extensive discussions with counsel over his concerns that the intended losses calculated by the Government were significantly inflated. Eisner agreed to enter into the Plea Agreement based on counsel's assurances that an argument could be made at sentencing that the intended loss amount would not have resulted in an actual loss. E-mail correspondence between Eisner and counsel in which they discuss whether to accept the Agreement clearly evidences that the parties contemplated such an argument. In an e-mail between counsel and Eisner dated June 20, 2014, counsel states: "At sentencing, if we have evidence that some of the "intended loss amount ultimately would not have resulted in an actual loss, we can present that if we think it would be helpful for sentencing." In another e-mail on the same date, counsel states: "It seems to me that the best of the available options is to agree to their figure for intended loss, then at sentencing emphasize the much lower amount of actual loss, and point out at sentencing any facts that indicate some of the 'intended' loss amount would probably not have actually occurred." Please see said e-mail correspondence attached hereto as Exhibit B. Eisner also sent a copy of his Investigation Summary prepared by the F.B.I. with his handwritten notes reflecting the correct attempted loss amounts to counsel as discussed in said e-mail correspondence. A copy of said Investigation Summary is attached

hereto as Exhibit C.

Moreover, as discussed herein, the amount of the actual loss as specified in the Restitution Order was inflated by at least $110,000.00 as a result of American Express filing a claim that exceeded the amount of their actual loss and due to several of the victims' claims including interest and late fees contrary to Application Note 3(D)(i) of U.S.S.G. § 2B1.1.

As evidenced on the attached Investigation Summary, the amount of the "attempted loss" is incorrect or overstated in the following respects:

1. The attempted loss for Bank of America is listed as $1,278,700.00 plus $350,000.00 additional for "losses included with above referenced Bank of America Fraud". The actual loss was $349,963. As detailed to counsel, the attempted loss was the result of the initial deposit of several checks totaling $361,250.00 of which $349,963 was withdrawn. The additional deposits after said withdrawals were made on separate occasions only after the account had become negative due to the first deposit being reversed. Thus, there was never an attempt or a possibility to withdraw additional funds from the account in which the checks were deposited. Moreover, the attempted loss was double counted with the attempted loss listed in row 17 which lists an attempted loss to Fidelity of $1,835,580.00. Fidelity was the bank from which the checks deposited into the Bank of America account were issued. Thus, there is an impossibility that the same loss could be caused to both Bank of America and Fidelity. As a result of said double counting and impossibility the attempted loss attributed to this aspect of the offense conduct is inflated by approximately $3,104,030;

2. The attempted loss listed in row 3 to Suntrust is listed as $196,200.00 which was calculated by adding up the total amount of the returned payments that were made in an attempt to have the titles released. The total amount

15

of the principal on the loans was approximately $150,000. Of this amount, approximately $30,000 was a loan secured against a 2010 Ford Fusion owned by Eisner which he utilized as a vehicle by Eisner in which all payments were timely made for approximately 1 year and was not part of the conspiracy. Moreover, Eisner cooperated in surrendering the vehicles to Suntrust once he was unable to make the payments. The actual loss after the sale of the collateral was $35,544.21 (assuming the inclusion of $9,303.56 for the Ford Fusion). Thus the attempted loss to Suntrust was grossly overstated;

3. The attempted loss to American Express in row 6 is listed as $228,868.00 which is also the amount listed as an actual loss. It is unclear how the Government arrived at this number. As detailed herein, the amount of this claim has changed numerous times throughout the proceedings and the actual loss is included in the Restitution Order is inflated by at least $110,000.00;

4. The attempted loss to BB&T listed in row 10 is $117,638. The amount is calculated using the total amount of the payments made to increase the available credit on the card. Said payments resulted in Eisner obtaining $19,000 from the account, of which approximately $21,000 was the existing balance on the card for legitimate purchases. Moreover, Eisner repaid $23,000 on the account which reduced the actual loss to approximately $18,000. Due to the $18,000 resulting from legitimate purchases over a period of approximately three years said amount should not have been included as actual losses;

5. The attempted loss attributed to TD Bank in row 12 is listed as $146,400. Said amount is the total of three checks written from the account to pay off the Suntrust auto loans. This amount was included in the attempted loss figures attributed to Suntrust and was both double counted and an

impossible loss.

Thus, the attempted loss figures are inflated by approximately $3,300,000 due to both the impossibility of loss and double counting in some instances. Moreover, as further detailed herein, the actual losses as reflected in the Restitution Order are inflated by at least $110,000. Despite Eisner's extensive discussions with counsel regarding his concerns and the issues with the loss figures, counsel failed to act with any due diligence to investigate said issues, to consider introducing mitigating evidence at sentencing or as further explained herein failing to exercise any reasonable judgment with respect to restitution issues. Not only are the inflated losses a basis for a downward departure under the Guidelines, a basis the Court never even got to consider, but they are relevant under 18 U.S.C. § 3553(a)(6) in avoiding unwarranted disparity among defendants convicted of similar conduct. Notably, the significantly lower loss figures would have been relevant in avoiding unwarranted disparity from Head. At sentencing the Government argued that Eisner's loss figures were approximately the same as Head's, a gross misrepresentation, which is even more significant in light of the correct actual loss figures.

Counsel's failure to investigate and offer evidence with respect to the substantially overstated intended and actual loss figures at sentencing was a significant error that was not based on objectively reasonable judgment. As a result, Eisner was prejudiced since the Court was unaware of the aforesaid facts regarding the loss figures. The Court was not presented with the basis for a downward departure. See United States v. Zedner, 401 F. 3d 36, 53 (2d Cir. 2005) (remanding for resentencing where the District Court did not consider a downward departure based on loss figures attributable to phony bonds overstating the seriousness of the offense. "That remark seems to indicate

that the court believed it could not depart downward based on the obviously phony nature of the bonds because the jury had rejected Zedner's argument that he lacked a criminal state of mind on account of his delusional belief that the bonds were genuine.  There is no incompatibility between a jury's finding that the defendant did not delusionally believe phony bonds were genuine and a court's conclusion that the severity of the offense was diminished by the obviously spurious nature of the bonds.").  Thus, such an argument is in no way incompatible with or otherwise negates criminal intent.

While the Court varied downward from the Guidelines range it would have varied further due to the weight assigned to the loss figures in avoiding unwarranted disparity under 18 U.S.C. § 3553(a)(6).  Thus, if not for counsel's errors it is likely that Eisner would have received a more lenient sentence.

C. **Counsel failed to object to prosecutorial misconduct and failed to investigate and present rebuttal evidence at Sentencing.**

Counsel failed to object to prosecutorial misconduct and failed to investigate and present rebuttal evidence at Sentencing. Said errors fell below an objective standard of reasonableness and prejudiced Eisner by resulting in a sentence that was longer than would have otherwise been imposed. While the Government is required to prove the applicability of an enhancement by a preponderance of the evidence, "If the district court relies on information in the presentence report (PSR) in making findings, the defendant bears the burden of establishing that the information relied on by the district court in making its findings is incorrect; mere objections are insufficient."). United States v. Randall, 171 F. 3d 195, 210-11 (4th Cir. 1999).

As discussed in detail in Section VI herein, the Government committed prosecutorial misconduct in several respects that significantly prejudiced Eisner. First, counsel failed to object to the Government's argument at Sentencing in favor of the application of the two-point production enhancement pursuant to 2B1.1(b)(11)(C) to Eisner's Guidelines range. Specifically, counsel failed to respond to or advise the Court of the Government's misrepresentation that both Head and Eisner opened the account in K.C.'s name (See Sentencing Tr. Pgs. 5-6; 25, 1; stating that "They opened this account".) and the Government's representation to the Court that they "have evidence that Mr. Eisner knew exactly what was going on all along." (Sentencing Tr. Pg. 6, 78). Counsel was well aware that the final version of the Statement of Facts filed in this case amended the Statement of Facts to provide that Head had opened the account in K.C.'s name. The language was the result of negotiations between the parties that counsel himself was part of.

More egregious was counsel's failure to object to the Government's statement that they were in possession of evidence that "Mr. Eisner knew exactly what was going on all along" despite the Government never presenting any of said "evidence" to Eisner or to the Court at any time. As discussed herein, if the Government had evidence that Eisner was involved in the opening of the account, it acted in bad faith by expressly agreeing to a stipulation that Head opened the account.

The Government's arguments to the contrary at sentencing were nothing other than bad faith in changing its position at sentencing. Moreover, by not objecting to the breach of the Agreement and objecting to the Government's misrepresentations of having evidence by requiring the Government to expressly produce said "evidence", Eisner's due process rights were violated. While counsel objected to the two-point enhancement he did so at the direction of Eisner, in conclusory terms, and without conducting any investigation into the facts surrounding the creation of the Fidelity account. Counsel argued at Sentencing that "It wasn't opened in Mr. Head's name and obviously would have been used -- when it's opened, it would have used identifiers for KC. Mr. Eisner would have understood that reality." (Sentencing Tr. Pg. 5, 3-7). Eisner and Head never discussed "opening an account" in K.C.'s name. To the contrary, as detailed in both Eisner's discussions with counsel and in Eisner's letter to the Court, Eisner was informed by Head that he was utilizing a preexisting account to which K.C. was agreeable to in exchange for compensation. In addition, the Statement of Facts makes clear that Head opened the account and Head's Statement of Facts provides that Head was utilizing accounts belonging to K.C. well before the formation of the conspiracy. A summary of the Fidelity account information provided to Counsel during discovery by the Government provides further evidence that Head created the account. Said

summary lists an address of for K.C. of "1710 Abercromby Court" which is a property that is owned by Mr. Head. Said Summary is attached hereto as Exhibit D.

As discussed herein, the two-point production enhancement is concerned with the act of producing a means of identification to obtain a means of identification. The Government attributed the application of the enhancement to Eisner based on the existence of a conspiracy. Yet counsel offered no argument or rebuttal evidence that creation of the account was in anyway reasonably foreseeable as being within the scope of the conspiracy (i.e., the opening of the account a objective of the conspiracy). Counsel failed to conduct any investigation into the creation of the account to enable him to offer a proper basis to object to the application of the two-point production enhancement. Moreover, counsel failed to subject the Government's arguments in favor of application of the enhancement to any meaningful adversarial testing, notably failing to object to the Government's representation that they had evidence that Eisner "knew what was going on all along". Furthermore, counsel failed to inform the Court that the two-point enhancement was not even applied to Head's Guideline calculation.

Eisner was prejudiced since the two-point production enhancement resulted in a higher Guideline range which resulted in a longer sentence than he would have otherwise received (as discussed in detail herein). Moreover, the application of the enhancement impacted the Court's analysis under 18 U.S.C. 3553(a)(6) in attempting to avoid unwarranted sentencing disparity between Eisner and Head, which resulted in a lower downward variance as further detailed herein.

Counsel also failed to object to the Government's misrepresentations regarding the actual losses resulting from the conspiracy. As discussed herein,

at Sentencing the Government argued that Eisner received "hundreds of thousands of dollars" more than Head from the conspiracy proceeds. "Hundreds of Thousands of dollars that were part of their joint activity went to Mr. Eisner. So in that respect while they're both responsible for the losses, the notion that the losses are higher for Mr. Head and not for Mr. Eisner are a bit deceiving, because it was Mr. Eisner for the actual losses that benefitted more than Mr. Head...he did benefit roughly the same amount, more than a million dollars. It's significant in and of itself." (Sentencing Tr. Pgs. 8-9, 24-25, 1-12). However, of the actual losses resulting from the conspiracy, only the debt of $349,963.00 owed to Bank of America was attributed to Mr. Head as well. As explained further herein, Eisner received approximately $50,000 more than Head from the conspiracy proceeds. Thus, the majority of the actual losses in Head's case were attributed to debts that were incurred solely by him outside of the conspiracy. Head's actual losses were at least $600,000 higher than Eisner's.

While the Court did not provide an adequate explanation for arriving at the sentence that it imposed, it is clear from a review of the Sentencing Transcript that the Court relied on said misrepresentation as a basis for avoiding unwarranted disparity under § 3553(a)(6). Counsel's errors were not objectively reasonable and prejudiced Eisner by resulting in a longer sentence than would have otherwise been imposed. Counsel failed to render adequate assistance to subject the Government's arguments to adversarial testing. Most significantly, counsel failed to object to prosecutorial misconduct relating to the application of the two-point production enhancement to Eisner's Guideline range. As a result, Eisner had a significantly higher starting point with a Guideline range that was nineteen months higher on the low-end of the Guideline range. Moreover, the errors impacted the Court's analysis under

18 U.S.C. § 3553(a) resulting in a longer sentence.

    D.   Counsel rendered ineffective assistance by instructing Eisner to execute a Restitution Order minutes prior to the Sentencing Hearing which Eisner advised Counsel provided restitution to several victims well in excess of their actual losses. As a result, Eisner suffered prejudice by receiving a sentence that exceeds the statutory maximum with respect to restitution.

Counsel rendered ineffective assistance by instructing Eisner to execute a Restitution Order minutes prior to the Sentencing Hearing which Eisner advised counsel provided restitution to several victims in excess of their actual losses. As a result of counsel's errors, Eisner was prejudiced by receiving a sentence that exceeds the statutory maximum with respect to restitution.

A defendant who signs an appeal waiver can "not be said to have waived his right to appellate review of a sentence imposed in excess of the maximum penalty provided by statute." United States v. Marin, 961 F. 2d 493, 496 (4th Cir. 1992). Since federal courts lack "the inherent authority to order restitution, but must rely on a statutory source...a restitution order that exceeds the authority of the statutory source 'is no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." United States v. Broughton-Jones, 71 F. 3d 1143, 1147 (4th Cir. 1995). The Mandatory Victims Restitution Act of 1996 ("MVRA") provides that the court "shall order...that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). The MVRA provides that the restitution order be limited to the "losses to the victim caused by the offense." United v. Llamas, 599 F. 3d 381, 390-91 (4th Cir. 2010). Moreover, the Sentencing Guidelines provide that courts are to enter restitution for the full amount of a victim's loss if authorized under a particular statute. U.S.S.G. § 5E1.1(a). In addition,

Application Note 3(D) to U.S.S.G. § 2B1.1 provides that "Loss shall not include...Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs."

While the Plea Agreement provides that Eisner agree "to the entry of a Restitution Order for the full amount of the victim's losses," he "did not agree...to relieve the government of its burden of proving that [his] restitution obligation included only those losses caused by [his] criminal conduct." United States v. Patty, 992 F. 2d 1045, 1051 (10th Cir. 1993). Moreover, 18 U.S.C. § 3664(e) provides that the Court must determine restitution disputes based on a preponderance of evidence. Moreover, a defendant bears the burden of establishing that the information in the presentence report is incorrect. See Randall, 171 F. 3d at 210-11 (holding that "mere objections" to incorrect information in the PSR "are insufficient").

American Bar Association Criminal Justice Standard 4-4.1 imposes upon defense counsel a broad duty to investigate the facts relevant to the merits of the case. ABA Standard 4-8.1 provides that "Defense counsel should present to the court any ground which will assist in reaching a proper disposition favorable to the accused. If a presentence report or summary is made available to defense counsel, he or she should seek to verify the information contained in it and should be prepared to supplement or challenge it if necessary. Moreover, as the Supreme Court has held, "[c]ounsel has a duty to bring such skill and knowledge as will render the trial a reliable adversarial testing process." Strickland, 466 U.S. at 688.

E-mail correspondence between Eisner and counsel leading up to the Sentence Hearing on October 31, 2014 clearly establishes that Eisner advised counsel on numerous occasions that the actual loss figures, particularly with respect to the debt owed to American Express, as listed in the Presentence Reports

were incorrect and grossly overstated. The initial Presentence Report was filed with the Court on October 3, 2014, less than thirty-five days before sentencing as required under U.S.S.G. § 6A1.2. Upon review of the Presentence Report, Eisner notified counsel that there were several mistakes with respect to the actual loss figures owed to American Express, BB&T and Suntrust Bank. The Investigation Summary (attached hereto as Exhibit C) lists the actual losses owed to American Express as $228,868.00.

The initial Presentence Report listed the actual loss as being less than the Investigation Summary, however, Eisner advised Counsel that this amount was still significantly overstated. A amended Presentence Report was filed on or about October 20, 2014 in which the amount of the actual loss again changed. Eisner again advised counsel that this amount was incorrect. A final Presentence Report was filed on or about October 28, 2014, a mere three days before Sentencing, and again reflected significant differences in the actual loss figures from the earlier Presentence Reports.

In an e-mail dated October 23, 2014 from counsel to Eisner, counsel states that "The restitution calculation keeps shifting and getting more complicated...I then sent an email to government counsel and the probation officer as follows: I think this where we are with our concerns/objections on a few of the restitution amounts in the final PSR filed October 20, 2014: American Express: we think the current total amount still owed to Amex is approximately $60,000 (about $17k on one account and about $43k on another). Mr. Eisner is attempting to get documentation." A copy of said e-mail correspondence is attached hereto as Exhibit E.

In the same e-mail chain, counsel states "There is a possibility that a separate restitution hearing may have to be set for a later date. That is not unusual, especially when the restitution calculation is complicated and

not able to be handled by mutual consent of the parties." See Exhibit E.
An e-mail dated October 28, 2014 from counsel to Eisner again mentions
scheduling a separate restitution hearing "If we cannot resolve the restitution
amount by Thursday, then we may need to ask for a separate restitution hearing."
See Exhibit E. During the ten day period prior to the Sentencing Hearing,
Eisner gathered and sent numerous files to counsel via e-mail to support that
the actual losses to BB&T and Suntrust were overstated. However, Eisner was
only able to obtain a statement for one of the two American Express accounts
and it was not a final statement. Eisner contacted American Express via
telephone in connection with the account in his name and had to have his wife
also contact American Express as the second account was in her name. Mrs.
Eisner was advised that it would take approximately 15 business days to obtain
the statement since the account had been closed and removed from the active
system.

    Eisner advised counsel that he was unable to obtain the second statement
to rebut the actual loss figures listed in the Presentence Report. Counsel
stated that he would discuss the unresolved issues regarding the debt owed
to American Express with Eisner in person on the morning of the Sentencing
Hearing. The actual losses owed to BB&T were reduced to approximately $18,000
prior to the Sentencing Hearing to reflect a payment of approximately $23,000
made to BB&T. However, Eisner also advised counsel that the BB&T debt was
incorrect in that the $18,000 loss included legitimate account activity that
occurred over a three year period. A statement from said BB&T account for
January of 2012 reflects that as of January 27, 2012, the account was in good
standing and had a balance of $18,952.93. Moreover, a statement for the same
account for March of 2012, which reflects the fraudulent activity includes
finance charges and late fees. A copy of said statements are attached hereto

as Exhibit F. Thus, not only is the actual loss attributed to BB&T in excess of the loss incurred but said loss also includes significant finance charges and late fees which continued to accrue for a significant period of time. The inclusion of significant interest and late fees is also an issue with respect to the remaining actual losses attributed to Eisner's credit card accounts. The issues with Suntrust are addressed in more detail in Section IV A.2 hereof.

In addition to Eisner informing counsel on numerous occasions that the actual losses were significantly overstated and incorrect, a review of the documentation provided to counsel during discovery provided a basis to objecting to the Presentence Report's calculation of the actual losses. The Declaration of Victim Losses filed by American Express lists an actual loss of $170,946.99. A copy of said Declaration is attached hereto as Exhibit G. Attached to the Declaration is a two-page spreadsheet of alleged charges incurred for three accounts between December 23, 2010 through January 22, 2011.

There are so many issues with the listed accounts, charges and dates that counsel's failure to conduct any further inquiry to verify the information supports the argument that counsel did not even review the document. First, the alleged charges are not even during the period of the offense conduct, they are from over a year prior. See Statement of Facts, Pgs. 9-10, ¶¶ 31-33). As stated in the Government's own notes on the Investigation Summary (See Exhibit C) "AMEX acct records indicate that between 10/11 and 3/12, Eisner transferred $54,723 to Mark Head's Paypal account." The charges are not even listed on the Declaration. In fact, the charges occurred approximately a year later. Second, the account numbers are not correct. The American Express statement for March of 2012 which was provided to counsel by both Eisner and the Government in discovery is for one of two American Express accounts utilized

by Eisner. A copy of said statement is attached hereto as Exhibit H. The account number ending in 9-71004 is not included on the Declaration's spreadsheet. What's worse, the charges evidencing the fraudulent conduct are over a year after the last charge represented on the Declaration. The total balance on the card as of March 29, 2012 was $7,487.12. Finally, the account ending in 9-71004 required the majority of the balance to be paid in full each month with a small portion carried over to the following month. The second American Express account was a business account that required the balance to be paid in full each month. There is no possible way in which charges could have been accrued in 2010 and in January of 2011 and that the accounts would have been in good standing in late 2011 and early 2012 in order for the fraudulent charges to have        incurred. The balance on the second American Express account was $43,000. The total actual loss for both accounts was between $50,000 and $60,000.

Despite the foregoing, at no time in the days leading up to Sentencing did counsel object to the actual loss figures. Rather counsel informed Eisner minutes prior to the Sentencing Hearing that he had to sign the Restitution Order based on the Declaration. With Eisner's mother present, Eisner informed counsel that the charges listed on the spreadsheet were not his and that he wanted to advise the Court that additional time was needed to obtain the American Express statement for the other account. Counsel told Eisner he had to accept and that "you will likely never repay this amount in a lifetime."

Counsel's performance was no way near meeting an objective standard of reasonableness. As a result of counsel's errors, Eisner's due process rights to challenge the loss figures were violated. The Restitution Order includes losses in excess of $100,000 of the losses incurred by American Express. Said losses exceed the statutory maximum. Moreover, Eisner was substantially

prejudiced as the actual loss figures were given significant weight in both the Government's arguments at sentencing and the Court's analysis under 18 U.S.C. § 3553(a). If not for counsel's errors, there is a reasonable probability that Eisner would have received a lower sentence.

In addition to the foregoing, it is worth noting that Eisner had substantial difficulty in preparing this Motion and pursuing relief as a result of counsel failing to and/or refusing to send Eisner copies of his legal documents while incarcerated despite numerous requests from Eisner's mother and from Eisner through the B.O.P. e-mail system. Please see the attached e-mail correspondence from Eisner's mother to counsel attached hereto as <u>Exhibit I</u>. Eisner had to rely on his mother to attempt to gather as many documents as she could obtain from Eisner's own records. As a result, Eisner is missing relevant documentation and has been delayed and disadvantaged in pursuing grounds for relief. As of the date hereof, not a single document or communication has been received from counsel.

WHEREFORE, Eisner respectfully requests that the Court amend the Restitution Order to include the actual losses incurred by the victims, at a minimum by American Express, vacate Eisner's sentence and resentence him as requested herein, issue a Rule to Show Cause against American Express for filing a fraudulent Declaration of Victim Losses under the penalty of perjury and grant such other and further relief as the Court deems just and proper.

V.   Argument - Legality of Sentence

   A.   The sentence imposed is both procedurally and substantively
        unreasonable and violates the Equal Protection Clause.

The sentence imposed in this case is procedurally and substantively
unreasonable and violates the Equal Protection Clause of the United States
Constitution.  "A criminal sentence violates the Equal Protection Clause 'only
if it reflects disparate treatment of similarly situated defendants lacking
any rational basis.'"  United States v. Rodriguez, 473 Fed. Appx. 310 (4th
Cir. 2012) (citing United States v. Pierce, 409 F. 3d 228, 235 (4th Cir. 2005)).
Procedural error can arise where the district court improperly calculates the
Guidelines Range, fails to consider the § 3553(a) factors or fails to explain
its sentence.  See Gall v. United States, 552 U.S. 38, 51 (2007);  see also
United States v. Diosdado-Star, 630 F. 3d 359, 365 (4th Cir. 2011) ("when
applying a departure provision or varying from the Guidelines range, the
district court must give 'serious consideration to the extent' of the departure
or variance, and must adequately explain the chosen sentence to allow for
meaningful appellate review and to promote the perception of fair sentencing.").
Moreover, the Court is required under 18 U.S.C. § 3553(c) at the time of
sentencing to "state in open court the reasons for its imposition of the
particular sentence, and, if the sentence...(2) is not of the kind, or is
outside the range, described in (a)(4), the specific reason for the imposition
of the sentence different from that described, which reasons must also be stated
with specificity in a statement of reasons form issued under [28 USCS §
994(w)(1)(B)]...".  See also United States v. Hughes, 401 F. 3d 540, 546 (4th
Cir. 2005) (stating that "If the court imposes a sentence outside the guidelines
range, it should explain its reason for doing so.").

A sentence will be found to be substantively unreasonable when "the

district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." United States v. Brinley, 684 F. 3d 629, 633 (6th Cir. 2012). A sentence will also found to be substantively unreasonable where the sentence results in an unwarranted sentencing disparity among similarly situated defendants that have been found guilty of similar conduct.

As stated herein, Section 3 of the Agreement specifically provides that the sentence imposed is "subject only to review by higher courts for reasonableness." To the extent this language is inconsistent with the general appeal waiver in Section 5 of the Agreement, the ambiguity is to be construed against the Government. To the extent the language can be found not to be ambiguous, the language of Section 3 reserves the right to appeal the imposed sentence on the basis of procedural and substantive reasonableness.

The Court's adoption of the Presentence Report's recommendation of a two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(11)(c) lacked any rational basis in that the enhancement was not applied to Head's Sentencing Guidelines calculation. As the Statement of Facts in both cases makes clear, Head was responsible for utilizing K.C.'s identity to obtain another means of identification, a Fidelity Cash Management account. The Government argued that the two-point production enhancement was applicable to Eisner as relevant conduct under U.S.S.G. § 1B1.3 by virtue of the fact that the case involved a conspiracy (The issues with respect to the applicability of the enhancement to Eisner are addressed elsewhere herein). However, there is no rational basis in holding Eisner accountable for the conduct of a co-defendant that not even the co-defendant himself was held accountable for. Such arbitrary application of a sentencing enhancement and the resulting higher Sentencing Guidelines

range and sentence is the type of disparate treatment that the Equal Protection Clause is intended to prevent.

Head had an additional sentencing enhancement applied to his Sentencing Guidelines calculation pursuant to U.S.S.G. § 2B1.1(b)(16)(A) as a result of Presentence Report recommendation. Said enhancement did not apply to Eisner since Eisner did not have losses totaling over $1,000,000 from financial institutions. Eisner did, however, have one two-point enhancement that was not applicable to Head for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3. Thus, the result of applying the two-point enhancement pursuant to U.S.S.G. 2B1.1(b)(11)(c) to Eisner and not Head resulted in Eisner having a Sentencing Guidelines range that was two-points higher than Head's (Level thirty to level twenty-eight, respectively). Both Eisner and Head decided to forego their right to trial and plead guilty. Head plead guilty prior to being indicted since he was approached by the Government prior to being indicted. Head was rewarded for his cooperation by benefiting from a Motion for a Reduction for Substantial Assistance in which the Government recommended a ten-percent reduction in his sentence which the Court approved. Thus, Head's sentence was approximately forty-three months versus Eisner's sentence of seventy-two months.

At Eisner's sentencing hearing the Government argued that "we believe that a higher sentence is justified here for Mr. Eisner. He didn't cooperate the way Mr. Head did." (Sentencing Tr. Pg. 9, 6-8). However, at Mr. Head's sentencing hearing the Government argued, in response to counsel for Head arguing for a larger reduction, that Mr. Head was placing too much emphasis on his assistance since the Government had significant separate evidence against Eisner. Thus, the Government argued that Head should receive a minimal reduction for his cooperation. Moreover, the Government's argument in its

Sentencing Memorandum that Head's sentence of forty-eight months accounted for his cooperation was false, the parties were aware that his cooperation was addressed through an additional Motion filed by the Government as discussed at Eisner's sentencing hearing. The Court asked "But, was Mr. Head's case just straightforward or did he have some additional motion filed by the government in his case?". (Sentencing Tr. Pg. 11, 3-5). Counsel for Eisner responded "My understanding is the government made a recommendation of a deduction for cooperation of ten percent." (Sentencing Tr. Pg. 11, 7-9). Thus, the large disparity between the two sentences cannot be attributed to Head's cooperation.

The additional arguments the Government made at sentencing (with the exception of the fact that Eisner was an attorney and Head was not) with respect to the amounts of the loss and the total proceeds from the conspiracy received by each defendant were misrepresentations. "In addition, because it is a conspiracy case, Your Honor, as you recognized some of the losses are overlapping in that Mark Head was responsible for teaching Mr. Eisner about the fraud, but Mark Head did not benefit to the same amount for their co-conspirator activity that Mr. Eisner did. Hundreds of thousands of dollars that were part of their joint activity went to Mr. Eisner. So in that respect while they're both responsible for the losses, the notion that the losses are higher for Mr. Head and not for Mr. Eisner are a bit deceiving, because it was Mr. Eisner for the actual losses that benefited more than Mr. Head...we believe that a higher sentence is justified here for Mr. Eisner...he did benefit roughly the same amount..." (Sentencing Tr. Pgs. 8-9, 18-25 and 1-11).

To the contrary, a review of Mr. Head's Statement of Facts evidences that Head's actual losses through his own fraudulent conduct totaled at least $1,100,000. Moreover, Head's Restitution Order includes joint and several

liability with Eisner for $349,963 for losses caused to Bank of America, not for the actual losses incurred by other victims of the conspiracy. As stated in Eisner's letter, Head received a minimum of fifteen percent of the total proceeds from the conspiracy, a fact that the Government was aware of as the attached Investigation Summary evidences $54,723 being transferred from Eisner to Head. Head also received over $100,000 in cash payments from Eisner. Thus, of the joint and several conspiracy proceeds, Eisner received at most $50,000 more than Head ($349,963 minus $54,723 minus $100,000).

The Court attributed the disparate sentence to Eisner's background as an attorney: "And the reason for the six years is because I think you should be punished more than Mark Head because of your background as an attorney." (Sentencing Tr. Pg. 21, 19-21). This factor is the only basis that the Court offered for the imposition of Eisner's sentence. The Court placed an unreasonable amount of weight on this one factor and did not adequately account for mitigating circumstances and the § 3553(a) factors. Notably, the Court did not at any time address and account for Eisner's significant mental health history and substance abuse issues; his efforts to rehabilitate himself including attending residential rehabilitation, intensive pyschiatric treatment, attending recovery groups, achieving and maintaining sobriety, working a full-time job and reconnecting with his wife and daughter; Eisner's acceptance of responsibility for his conduct which included cooperating and answering every question that federal agents posed on the day of his arrest and signing a written confession on the day of his arrest prior to even talking with counsel; the fact that Eisner was only twenty-nine and thirty years old when the offenses occurred and had been practicing for only several years; Eisner's voluntary surrender of his law license and practice two and a half years prior to being arrested; the fact that Eisner suffered significantly more collateral

damage than Head; the fact that Eisner was a first time offender; and the extraordinary low risk for recidivism .

A disparity of approximately thirty months is substantively unreasonable since Head only received a minimal reduction for cooperation; both Eisner and Head plead guilty and accepted responsibility; Head's conduct spanned a period of at least seven years; Head, by the Government's own admission and as reflected in Head's SOF, taught Eisner and directed the conspiracy; both had identical Guideline ranges and Criminal History Categories of I; both benefited approximately equally for the joint and several debt arising from the conspiracy; Head utilized K.C.'s identity and his bank accounts; Head's actual losses totaled at least $600,000 more than Eisner's; and since the two-point production enhancement was applied only to Eisner.

While the Fourth Circuit has recognized that 18 U.S.C. § 3553(a)(6) is aimed at eliminating disparity between similarly situated offenders nationwide and not between co-defendants, the defendant receiving the lengthier sentence from a co-defendant cannot be arbitrarily singled out. See United States v. Withers, 100 F. 3d 1142, 1149 (4th Cir. 1996); see also United States v. Truelove, 482 F. 2d 1361 (4th Cir. 1973). The application of the two-point production enhancement to Eisner and not to Head was nothing other than arbitrary, and resulted in a sentence that was procedurally unreasonable. Said arbitrary application was significant in this case because it resulted in a starting Guideline range that was nineteen months higher than Head's Guideline range.

As the Supreme Court recently held in Peugh v. United States, 133 S. Ct. 2072, 2083 (2013), the advisory nature of the Guidelines does not cure the harm that results from utilizing an incorrect Guidelines range as a starting point, that "district courts must begin their analysis with the Guidelines

and remain cognizant of them throughout the sentencing process," and that an increase in the Guidelines range creates a "significant risk of a higher sentence." See also United States v. McManus, 734 F. 3d 315, 322-323 (remanding to the District Court for resentencing even though the imposed sentence of seventy-two months was below the low end of the Guideline calculation of ninety-seven months. "We cannot say with certainty that the District Court would not have sentenced McManus to even less time in custody if it had used the proper starting point."); Whiteside, 748 F. 3d at 551 (holding that the application of a career offender enhancement amounted to a gross miscarriage of justice since the "Guidelines range, although advisory, retained its anchoring effect throughout Whiteside's sentencing. It is just that the anchor was dropped in the wrong place.").

Thus, while a sentence equal to or slightly higher than Head's may have been justified based on his position as an attorney (under a correct application of the facts), the higher starting point that resulted from the arbitrary application of the two-point production enhancement to Eisner's Guideline calculation violates the Equal Protection Clause in that it lacks any rational basis. Moreover, the Court failed to adequately explain the sentence it imposed and failed to consider the § 3553(a) factors. The Court did not state whether it was departing or varying from the Guidelines in open Court or in writing, or state the reasons for the extent of the variance. See U.S.S.G. § 5K2.0(e) and 18 U.S.C. § 3553(c); see also United States v. Engle, 592 F. 3d 495, 505 (4th Cir. 2010) (holding a non-Guidelines based sentence unreasonable in light of the district court's explanations at sentencing).

In addition to said procedural error, Eisner's sentence was substantively unreasonable with respect to both Head's sentence and similarly situated defendants nationwide. The chart attached hereto as Exhibit M evidences the

significant disparity in sentences imposed on lawyers in this and other jurisdictions. Many of the cited cases involved significantly greater losses, much older and more experienced attorneys, more victims and defendants that went to trial and did not accept responsibility for their conduct. For instance, in United States v. Offill, 666 F. 3d 168 (4th Cir. 2011), a case in the same district, involving an attorney convicted of nine counts of wire fraud and securities fraud, actual losses of over $2,000,000 and over 250 victims, and despite proceeding to trial and defending himself in what the district court called "one of the biggest pack of lies that I think I have ever heard from any defendant testifying in all my years of trial litigation," Offill nonetheless received a sentence that was approximately 43% below the low end of his Guideline range and was only twenty-four months greater than the sentence imposed in this case.

      **B.**    **The Court did not adequately resolve disputed factors pursuant to U.S.S.G § 6A1.3 and incorrectly held that the Government had met its burden of proof for the application of a two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i).**

The Court did not make specific factual findings to adequately resolve Eisner's objection to the Presentence Report's recommendation of the application of a two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i) and incorrectly held that the Government had met its burden of proof for the application of the enhancement which violated Eisner's due process rights. "Reliance on the [presentence report] is insufficient when the facts are in dispute. Rather the district court must actually find facts, and it must do so by a preponderance of the evidence." United States v. White, 492 F. 3d 380, 416 (6th Cir. 2007). At sentencing, the Court may consider relevant evidence so long as it is supported by a sufficient indicia of reliability.

U.S.S.G. § 6A1.3(a).

The Presentence Report recommended the application of a two-point production enhancement for the use of K.C.'s identity to obtain another means of identification, a Fidelity Cash Management account. The Government argued in favor of the enhancement at sentencing and the Court overruled Eisner's objection to the enhancement and adopted the Presentence Report. Both the Presentence Report and the Government argued the production enhancement was applicable to Eisner since Eisner was a participant in a conspiracy with Head and Head had used K.C.'s identity to open the Fidelity account. Notwithstanding Eisner's arguments herein that the Government committed prosecutorial misconduct in arguing for the application of the production enhancement, the Court failed to determine the scope of the criminal activity that Eisner "agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement)." The district court must then determine whether the conduct of others was reasonably foreseeable. U.S.S.G. § 1B1.3, comment n.2; See United States v. Studley, 47 F. 3d 569, 574 (2d Cir. 1995) (stating that in order to hold others accountable for the acts of others under U.S.S.G. 1B1.3(a)(1)(B) a district court must make two particularized findings: (1) that the acts were within the scope of the defendant's agreement; and (2) that they were reasonably foreseeable to the defendant."); See also United States v. Jenkins, 4 F. 3d 1338, 1347 (6th Cir. 1993) (holding that § 1B1.3 requires a differentation between co-conspirators to reflect their varying degrees of culpability.).

The Court made conclusory findings that the production enhancement was applicable to Eisner. "I understand your objection, and I--I'm going to overrule it. I think because it's a conspiracy case that a coconspirator can be--co-conspirator can be liable for the acts of his accomplices, even if he

doesn't know about all of the acts being taken, so long as they're reasonably foreseeable under the guidelines. So, having said that, the guideline objection will be overruled, and the guidelines remain as stated in the presentence report." (Sentencing Tr. Pg. 6, 15-24). The Court made no determination whether the production of K.C.'s identity was within the scope of Eisner's agreement with Head. The Court may have been influenced by the Government's assertions regarding the use of K.C.'s identity and the possession of "evidence" by the Government that Eisner "knew what was going on" (as discussed in detail herein) but it heard no evidence to support that Eisner in anyway agreed with Head to use K.C.'s identity to obtain a means of identification.

To the contrary, Eisner's letter to the Court provided that Eisner was informed by Head that he already had an account of K.C.'s that he could utilize with K.C.'s consent. Moreover, the Statement of Facts in Head's case provides that Head was utilizing K.C.'s accounts and/or identity as early as November of 2011, before the formation of the conspiracy. At no time during the sentencing hearing did the Court request that the Government present any of its "evidence" supporting the application of the production enhancement by a preponderance of the evidence. Thus, while a Court is permitted under U.S.S.G. § 6A1.3 to consider relevant evidence "provided that the information has sufficent indicia of reliability," it never heard any evidence and failed to make specific findings of fact to support the application of the enhancement. As a result, Eisner's due process rights were violated and the enhancement lead to a higher sentence than Eisner would have otherwise received.

## VI.   Argument - Prosecutorial Misconduct

### A.   The Government breached the Plea Agreement and engaged in prosecutorial misconduct by arguing for the application of a two-point enhancement at sentencing pursuant to U.S.S.G. § 2B1.1(b)(11)(c).

The Government breached the Plea Agreement and engaged in prosecutorial misconduct by arguing for a two-point enhancement at sentencing pursuant to U.S.S.G. § 2B1.1(b)(11)(c).  A breach of a plea agreement occurs where the injured party is deprived of the benefit that it reasonably expected to receive from the Agreement.  United States v. Miller, 529 Fed. Appx. 331 (4th Cir. 2013).  A defendant alleging the Government's breach of a plea agreement bears the burden of establishing that breach and the defendant's satisfaction of his obligations under the agreement by a preponderance of the evidence.  United States v. Snow, 234 F. 3d 187, 189 (4th Cir. 2000).

Plea agreements between a defendant and the Government call for special due process considerations but are largely governed by the law of contracts. United States v. Conner, 930 F. 2d 1073, 1076 (4th Cir. 1991).  A violation of due process occurs when the Government breaches express or implied terms of the plea agreement.  Mabry v. Johnson, 467 U.S. 504, 509 (1984).  Since violations of plea agreements by the Government not only violate a defendant's Constitutional rights but also involve the "honor of the Government, public confidence in the fair administration of justice, and the effective administration of justice," a breach of a plea agreement by the Government constitutes plain error.  United States v. McQueen, 108 F. 3d 64, 66 (4th Cir. 1997).  The plain error standard requires a defendant to show that the error prejudiced him to the extent it effected the outcome of the proceedings.  United States v. Brown, 199 U.S. App. LEXIS 11333 (4th Cir. 1999).  To establish a claim for prosecutorial misconduct, a petitioner must show (1) that the

Government's conduct was improper; and (2) that the conduct prejudiced his substantial rights such that petitioner was deprived of a fair proceeding. See United States v. Golding, 168 F. 3d 700, 702 (4th Cir. 1999).

Section two of the Plea Agreement (the "Agreement") entered into between the Government and Eisner governs the "factual basis for the plea". Said section provides that the "Statement of Facts...constitutes a stipulation of facts for purposes of Section 1B1.2(a) of the Sentencing Guidelines." In consideration for Eisner pleading guilty to Counts 1, 2, 11 and 15 of the Indictment, the Government agreed, pursuant to section ten of the Agreement, "to dismiss counts 3-10, 12-14, and 16-21 of the Indictment against this Defendant."

One of the seventeen dismissed Counts was a charge under 18 U.S.C. § 1028A for the theft of K.C.'s identity. Documentation and correspondence exchanged by the parties during the negotiation of the Agreement clearly establishes the benefits each party expected to receive from the Agreement. The Government sought Eisner's quick guilty plea to four wire fraud counts, the joint recommendation of an extensive list of sentencing enhancements, stipulation to a broad and detailed Statement of Facts and Eisner's cooperation in any future prosecutions. In consideration for Eisner's promises and obligations under the Agreement, Eisner benefited by having the identity theft charge dropped and receiving a three point reduction for acceptance of responsibility.

The foregoing is supported by several e-mails exchanged between counsel for Eisner and the Assistant United States Attorney assigned to the case, Chad Golder. In an e-mail message dated May 29, 2014 from Mr. Golder to Eisner's counsel, Mr. Golder states "If your client pleads guilty quickly to the various wire fraud counts (and accompanying enhancements, which we can discuss), I will recommend to my supervisor that we drop the 1028A charge." A copy of

said e-mail correspondence is attached hereto as Exhibit J. An additional e-mail sent on June 19, 2014 included a specific mention by Mr. Golder of the benefit Eisner was to receive from the Agreement: "Your client is getting the benefit of no aggravated identity theft count." See Exhibit J.

Moreover, the revisions made to the Statement of Facts, which were incorporated into the Agreement "as a stipulation of facts for purposes of Section 1B1.2(a) of the Sentencing Guidelines" do not support the application of the enhancement. Said revisions are evidenced by a chain of e-mail correspondence between Eisner and his counsel, and Eisner's counsel and Mr. Golder, in which the parties discuss multiple revisions to the accompanying Statement of Facts. A copy of said e-mail correspondence and the Statement of Facts containing Eisner's handwritten notes are attached hereto as Exhibit K. As the e-mail correspondence evidences, the revised language was bargained for and was eventually incorporated into the final Statement of Facts filed in this case by the parties.

Section 8 of the Statement of Facts was changed from "For EISNER'S benefit, Head opened a Fidelity Cash Management account in the name of K.C.," to "Head opened a Fidelity Cash Management account in the name of K.C.". Moreover, paragraph 12(a) of the Statement of Facts was amended to remove that "The sole purpose of opening the account" was to commit a scheme of fraud.

In addition, the written statement prepared by the FBI agent assigned to the case during Eisner's confession was revised to provide that Head had procured the Fidelity account by utilizing K.C.'s identity (Eisner is not in possession of said written statement as counsel has not provided Eisner with a copy of his file as of the date hereof).

Despite the bargained for dismissal of the aggravated identity theft charge and the language specifying that Head utilized K.C.'s means of identification

42

to open the Fidelity account, the Government argued for the application of a two-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(11)(c) recommended by the Probation Officer in the Presentence Report. While the Government stated that it was not advocating for the application of the enhancement in their Sentencing Memorandum and stating at the sentencing hearing that they did not "seek this enhancement and our recommendation wasn't based on it," (Sentencing Tr. Pg. 5, 19-20), Mr. Golder went on to argue for it's application. "But just to get the facts straight, your Honor hit on exactly what we were going to say. Mr. Eisner's own letter indicates why this would apply on the facts. He went to Head and said, I need to steal more money. Teach me how to steal. They opened this account. They used K.C.'s name for the expressed purpose of this fraud...we have evidence that Mr. Eisner knew exactly what was going on all along." (Sentencing Tr. Pgs. 5-6, 20-25 and 1-8).

The Government deliberately misrepresented the facts by stating that both Eisner and Head utilized K.C.'s identity to open the Fidelity account which was contrary to the agreed upon and stipulated facts. Said misrepresentations were made with the sole purpose of influencing the Court. See United States v. Taylor, 77 F. 3d 368, 371 (11th Cir. 1996) (holding that the Government breached the plea agreement by expressing agreement with the Presentence Report's recommendation, "Presumably the Government attorney who made those statements thought they might influence the Judge, or else there would have been no point in making them.").

Moreover, the Government inexplicably stated that it had evidence that Eisner "knew exactly what was going on" despite stipulating otherwise in the Statement of Facts with respect to obtaining a means of identification and even with regards to the purpose and for whose benefit the account was opened for. In addition, the Government did not present so much as a scintilla of

43

said "evidence" at any time prior to or during sentencing. Such false assertions not only violated Eisner's due process rights by not granting him an opportunity to review and rebut the "evidence" but also failed to satisfy the Government's burden of proof that the enhancement was warranted by a preponderance of the evidence. See United States v. Grubbs, 585 F. 3d 793, 799-803 (4th Cir. 2009) (providing that the Government must show an enhancement applies by a preponderance of the evidence standard); see also United States v. Pham, 545 F. 3d 712 (11th Cir. 2008) (holding that Government's argument that for imposing a two-point enhancement for an offense involving 50 or more victims pursuant to U.S.S.G. § 2B1.1(b)(2) was not supported by a preponderance of the evidence showing that 50 or more victims suffered actual loss and as a result of that evidentiary deficiency the court could not sustain the enhancement).

The instant case is similar to United States v. Embree, 262 Fed. Appx. 499 (4th Cir. 2008), which involved a breach of a plea agreement by the Government where it argued for a two-point enhancement for possession of a dangerous weapon. The plea agreement in Embree incorporated a stipulation that the Government possessed "no information which would prevent [Embree] from meeting the criteria set forth in 18 U.S.C.A. § 3553(f)(1)-(4) and U.S.S.G. § 5C1.2(1)-(4)." Id. at 503. The Presentence Report recommended a two-level enhancement for possession of a dangerous weapon which the Government argued in favor of at sentencing. Id. at 501-502. The Court of Appeals held that while the plea agreement contained no language with respect to the dangerous weapons enhancement that the Government should not benefit from such a strict interpretation (citing United States v. Bowler, 585 F. 2d 851, 854 (7th Cir. 1978). Id. at 504.

By stipulating that it had no information that Embree possessed a dangerous

weapon and subsequently arguing at sentencing that Embree did possess a weapon in order for the enhancement to apply constituted a breach of the plea agreement. Id. at 505. The Court reasoned that the "Government entered into a stipulation in a plea agreement and changed its position at sentencing. In this instance, the Government stipulated that at the time of the plea agreement, it had no information that Embree possessed a dangerous weapon in connection with the offense. Like the prosecutors in Badaracco [954 F. 2d 928 (3rd Cir. 1992)], the Government did in fact possess information which contradicted the stipulation they later entered into under the agreement. The record in this case reveals that in fact, the Government had knowledge that Embree possessed multiple firearms in connection with the offense." Id. at 506; see also United States v. Badaracco, 954 F. 2d at 941 (holding that the Government breached the plea agreement where it argued in favor of a Presentence Report recommendation that the offense involved more than minimal planning despite a stipulation by the parties to the contrary).

In holding that the Government breached the plea agreement the Court in Embree concluded that "Embree relied on the Government's promise to adhere to this stipulation in deciding whether to enter a plea of guilty and thus forego his Constitutional right to a jury trial. The Government then changed its position at sentencing by arguing that Embree possessed a weapon in connection with the offense to which he plead guilty. The Government's argument for a 2-level enhancement for possession of a dangerous weapon in connection with the offense 'violated the spirit, if not the letter' of the plea agreement. Badaracco, 954 F. 2d 928, 940 (3rd Cir. 1992). The Government's argument provided the District Court with a basis for not only denying Embree the benefit of application of the safety valve provision, but also for the application of the 2-level sentencing enhancement. Therefore, we conclude that by arguing

for the 2-level enhancement under U.S.S.G. § 2D1.1(b)(1),the Government indeed breached its obligations under the plea agreement." Id. at 506.

In the instant case, the Government stipulated, pursuant to the negotiations of the parties, that "Head opened a Fidelity Cash Management account in the name of K.C.". (Statement of Facts Pg. 2, 8). However, at sentencing the Government argued that "They opened this account." Moreover, the Government stated that it had "evidence that Mr. Eisner knew exactly what was going on" but failed to present any of the alleged evidence to Eisner or to the Court. The most egregious aspect of the Government's advocation of the application of the enhancement is that Head, who was clearly responsible for opening the account and thus using a means of identification to obtain a means of identification, did not have the enhancement applied to his Guidelines calculation and was sentenced just a few weeks prior to Eisner.

Unlike Embree in which the Government presented the testimony of numerous witnesses at the sentencing hearings, the Government presented no evidence in which to establish that Eisner was accountable for unlawfully producing or obtaining another means of identification under U.S.S.G. § 2B1.1(b)(11)(c)(i). Comment (c)(i) which concerns the application of (b)(11)(c)(i) provides that the enhancement applies when a "means of identification of an individual...is used without that individual's authorization unlawfully to produce or obtain another means of identification." Thus, (b)(11)(c)(i) is applicable in the act of producing or obtaining a means of identification, not in the use of a means of identification as provided for under 18 U.S.C. § 1028A.

The Government argued at sentencing that Eisner's letter to the Court "indicates why this would apply on the facts". (Sentencing Tr. Pg. 5, 22-23). To the contrary, Eisner's letter states that Head "had a Fidelity account he

could send checks from through the bill pay service even though there were no funds in the account. I was told K.C. was Mr. Head's cousin and that he would receive several thousand dollars from Mr. Head for using the account". (See Eisner's Letter Pg. 7, para. 1). This is consistent with facts set forth in Eisner's written confession prepared by the FBI in which the FBI redacted and amended the statement to provide that Head opened the account.

Other than referring to Eisner's letter no evidence was presented to support that the enhancement was applicable under U.S.S.G. § 1B1.3. Commentary Application Note 2 to Section 1B1.3 provides that a defendant can be held accountable for the conduct of others and directs the Court to "first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's conduct...the conduct of others that...was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision." Moreover, Comment 2 provides that "a defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct." Id. As the Statement of Facts, and Eisner's letter and confession make clear, Head opened the account in K.C.'s name. Eisner had never even met K.C. and was told by Head that K.C. consented to the use of his existing account in exchange for the payment of several thousand dollars. Said money was paid to Head in both cash and as part of transfers to Head. (Please see Exhibit C evidencing transfers of $54,723 to Head).

The Court was not made aware of any of the circumstances involving the procurement of the Fidelity account. The Government provided no evidence or information regarding Head's relation to K.C.; how Head obtained K.C.'s identification information; whether Head had utilized K.C.'s identity in

connection with other accounts; whether the Fidelity account was opened even prior to the formation of the conspiracy; and no evidence that the scope of the agreement in any way encompassed objectives to unlawfully produce K.C.'s identity to obtain another identification. (See United States v. Mittelstaedt, 31 F. 3d 1208, 1218 (2d Cir. 1994) ("The gist of the crime of conspiracy...is the agreement...to commit one or more unlawful acts, from which it follows that the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects.").

The Statement of Facts filed in Head's ("Head's SOF") case provides some additional information regarding Head's use of K.C.'s identity. A copy of Head's SOF is attached hereto as Exhibit L. Paragraph 9 provides that "Head took over the bank and credit card account of other individuals known to him, including his friend, K.C.". (Head's SOF ¶ 9). Paragraph 10 provides an example of an instance in which Head utilized "convenience checks" from his mother's credit card account and deposited the checks into "bank accounts belonging to K.C.". Said conduct occurred as early as November of 2012 (Head's SOF ¶ 10). Thus, Head was utilzing K.C.'s identity in connection with bank accounts belonging to K.C. even prior to the formation of the conspiracy between Head and Eisner.

The Government's argument in favor of applying the production enhancement to Eisner was improper in that it referred to non-existent evidence, evidence which has never been produced and was contrary to the stipulations contained in the Statement of Facts. The Government's conduct violated both the "spirit and the letter" of the Agreement and deprived Eisner of the benefit that he reasonably expected to receive from the Agreement (to not be prosecuted in connection with the identity theft charge). What the Government did was to reduce their burden of proof from proving that Eisner knowingly stole K.C.'s

identity beyond a reasonable doubt under 18 U.S.C. § 1028A, which carries a consecutive sentence of twenty-four months, to proving just the production element of the enhancement by a preponderance of the evidence, which in this case increased the low end of the sentencing guidelines range by nineteen months.

What is worse, the Government attempted to meet their burden of proof by misrepresenting the facts and alluding to "evidence" that was never presented to Eisner or before the Court, denying Eisner a right to review and rebut any evidence against him. The Government's improper conduct prejudiced Eisner's due process rights and as such Eisner was deprived of a fair proceeding.

As a result of the Government's breach of the Agreement and prosecutorial misconduct, Eisner's Sentencing Guideline range was incorrectly calculated at a level thirty rather than a level twenty-eight. As the Supreme Court recently held in Peugh v. United States, 133 S. Ct. 2072, 2086 (2013), the advisory nature of the Sentencing Guidelines does not cure the harm that results from utilizing an incorrect Guidelines range as a starting point. See also United States v. Lewis, 606 F. 3d 193, 201 (4th Cir. 2010) ("because a correct calculation of the advisory Guidelines range is the crucial 'starting point' for sentencing, an error at that step 'infects all that follows at the sentencing proceeding, including the ultimate sentence chosen by the district court.'"). The Court after hearing the arguments of the Government in favor of the two-point production enhancement adopted the Presentence Report Sentencing Guideline range which had a low end of ninety-seven months. The Court imposed a sentence of seventy-two months, a downward departure or variance of approximately twenty-six percent.

As stated herein, the Court did not explain its decision to depart or vary from the Guideline range. However, had the Court utilized the proper

starting point of seventy-eight months the sentence would likely have been less than seventy-two months.  See United States v. McManus, 734 F. 3d 315, 322-23 (4th Cir. 2013) (holding that the District Court's sentence was procedurally unreasonable where the Government failed to meet their burden of proof for the application of sentencing enhancement.  Although the District Court imposed a sentence of seventy-two months which was below the low end of the Guidelines range of ninety-seven months, the Court reasoned that "We cannot say with certainty that the District Court would not have sentenced McManus to even less time in custody if it had used the proper starting point.").

B.    The Government committed prosecutorial misconduct at Sentencing by misrepresenting the facts which resulted in prejudice and deprived Eisner of a fair hearing.

The Government committed prosecutorial misconduct at Sentencing by misrepresenting the facts of the case which resulted in prejudice and deprived Eisner of a fair hearing.  In order to establish a claim for prosecutorial misconduct the petitioner must show (1) that the Government's conduct was improper; and (2) that the conduct prejudiced the petitioner's substantial rights such that the petitioner was deprived of a fair proceeding.  See United States v. Golding, 168 F. 3d 700, 702 (4th Cir. 1999).

The arguments made herein regarding the Government's arguments at Sentencing in favor of the application of the two-point production enhancement are hereby reasserted for the purposes of this section.  Moreover, the Government's arguments at Sentencing regarding the actual losses resulting from the conspiracy and other misrepresentations with respect to the disparity between Eisner and Head are also reasserted for the purposes of this section.

The Government's misconduct which resulted in the application of the two-

point enhancement to Eisner's Guidelines range deprived Eisner of his due process rights and resulted in a higher sentence than he would have received absent the enhancement. Moreover, as reflected in the Sentencing Transcript, the Court gave considerable weight under 18 U.S.C. § 3553(a)(6) to the Government's misrepresentations regarding the actual losses resulting from the conspiracy with Head. Said misconduct resulted in a longer sentence than would have otherwise been imposed since the Court was given an improper basis for avoiding disparity from Head and likely took the misrepresentations into account in its decision regarding the extent of the variance under § 3553(a).

WHEREFORE, the Defendant respectfully requests that the sentence imposed in this case of seventy-two months incarceration be vacated and that the Defendant be resentenced to a period of incarceration no greater than a period of 54 months, which represents a twenty-six percent departure from the low-end of the proper Sentencing Guidelines range of seventy-eight months; that the Court amend the Restitution Order to the correct amount as detailed herein; and to grant such other and further relief that this Court deems just and proper.

Respectfully Submitted,

Michael Lawrence Eisner